<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DAVID COOPER,                          :
                                       :    Civil Action No. 10-2901 (AET)
               Petitioner,             :
                                       :
          v.                           :    **OPINION**
                                       :
MICHELLE R. RICCI,                     :
                                       :
               Respondent.             :


**APPEARANCES:**

Petitioner <u>pro</u> <u>se</u>
David Cooper
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

Counsel for Respondent
Mary R. Juliano
Monmouth County Prosecutor's Office
Monmouth County Court House
71 Monument Park
Freehold, NJ 07728-1261


**THOMPSON,** District Judge

     Petitioner David Cooper, a prisoner currently confined at New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The respondent is Warden Michelle R. Ricci.

     For the reasons stated herein, the Petition will be denied.

I.   <u>BACKGROUND</u>

A.   <u>Factual Background</u>

The relevant facts are set forth in the opinion of the Supreme Court of New Jersey.[1]

On July 18, 1993, the six-year-old victim, L.G., her mother, R.G., and the victim's two sisters were at the home of R.G.'s sister-in-law, M.W., in Asbury Park. While M.W. was at the supermarket, R.G. sat on the front porch of the house with her youngest daughter. The victim and her other sister were with M.W.'s daughter playing in the frontyard. After playing in the frontyard for some time, the children moved into a fenced-in backyard.

While they were playing in the backyard, defendant lured the victim away from the other children and eventually picked her up, lifted her over the fence, and walked away with her. The other children went to the frontyard and told R.G. what had occurred. R.G., joined by M.W., who had just returned from the supermarket, began to search for and to call out to L.G., but they could not locate her. Soon after, neighbors joined in the search.

The Asbury Park Police Department was contacted shortly after L.G.'s disappearance, and police officers also joined the search. Within a few hours after the victim had disappeared, her body was found under a porch of an abandoned house. Defendant lived under that porch. L.G. was found lying on her back on a mattress with her shirt pulled up, her panties at her ankles, a pair of men's boxer shorts over her face, and her vaginal area exposed and bloodstained.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

The police found clothing and a bloodstained paper towel at arms's length from L.G.'s body. The police also found a gym bag that contained a wallet. Inside the wallet was defendant's social-security card. Defendant's latent fingerprints were found on a paper bag and on a malt-liquor bottle in the porch area. Several letters, photographs, and other documents in defendant's name were also found in the area.

That night, the police interviewed witnesses to the abduction, and defendant became a suspect almost immediately. Defendant was located the next day and was taken to police headquarters for questioning. The State concedes that defendant was in custody at that time. He was read his *Miranda* rights, and he signed a form waiving his rights to remain silent and to counsel. At that time, defendant denied any involvement in the child's death.

Soon thereafter, Detective John Musiello confronted defendant with the evidence that the police had against him and told him that they would seek a court order to obtain forensic evidence from his person. No law-enforcement officer, however, informed defendant that he was facing a potential death sentence. Instead, they told him that the perpetrator was facing a term of life imprisonment with thirty years of parole ineligibility.

Defendant then confessed to causing L.G.'s death. According to slightly varying police testimony, he dropped his head and stated either: (1) "It was an accident. I did it. I was drunk;" or (2) "It's an accident. I was drunk. I strangled her." Defendant explained that he had seen children playing at M.W.'s house on his way to the porch of the abandoned house and that he had told L.G. to come to him. He lifted her over the fence and led her underneath the porch of the abandoned house. Defendant then stated, "Then we had sex, and I strangled her" and that he had left her body underneath the porch. After further questioning, defendant admitted that he had ejaculated and that he had worn a condom which he later had discarded in a nearby field.

Defendant subsequently signed a formal written statement, in which he described the sexual penetration of L.G. as vaginal and stated that she had bled from

3

her vagina during the penetration, causing blood to get on defendant's clothes. He also told the police that he had been on top of L.G. during the penetration and that his hands had been on her neck.

An autopsy of L.G.'s body revealed dried blood on the skin of her lower abdomen and external genitalia. Numerous internal injuries were found in her vaginal canal and cervix. Her hymen was not intact. Her anal canal also showed signs of injury. The autopsy revealed swelling in L.G.'s trachea and lungs, petechial hemorrhages on the outer surface of the thymus, and swelling in her brain.

The medical examiner concluded that the injuries on and around L.G.'s neck, the edema in her lungs, and the swelling in her brain were consistent with asphyxia caused by manual strangulation. He also concluded that pressure probably had been applied for approximately four to six minutes because, for edema to form in the lungs, pressure would have had to have been applied for three to six minutes, and for irreversible brain damage to occur from lack of oxygen, pressure would have had to have been applied for four to six minutes.

The police obtained seven discarded condoms from a field, close to the abandoned house, to which defendant had led them, and obtained from defendant samples of his hair, saliva, and blood. None of the condoms tested positive for semen, although one had blood on it. Blood was found on the paper towel discovered under the porch, on the cushion on which L.G. had been found, on two pairs of sneakers found under the porch, and on defendant's jeans, t-shirt, and boxer shorts. No semen was found on L.G.'s clothes or person. Four pubic hairs found on L.G. were consistent with defendant's pubic hair, although they could not be linked to him conclusively.

State v. Cooper, 151 N.J. 326, 342-44 (1997).

B.    Procedural History

A Monmouth County Grand Jury indicted Petitioner on the following charges:  purposeful-or-knowing murder by his own conduct, contrary to N.J.S.A. 2C:11-3a(1) or (2) (count one);

felony murder, contrary to N.J.S.A. 2C:11-3a(3) (count two);

first-degree kidnapping, contrary to N.J.S.A. 2C:13-1b (count

three); and two counts of first-degree aggravated sexual assault,

contrary to N.J.S.A. 2C:14-2a(1) and 2C:14-2a(3) (counts four and

five alleging rape and sodomy).  Following a jury trial,

Petitioner was convicted on all counts.

Thereafter followed the penalty phase of the proceedings.

At the ensuing penalty phase before the same jury,
the State relied on three aggravating factors: (1) that
the murder was outrageously or wantonly vile, horrible,
or inhuman in that it involved depravity of mind,
N.J.S.A. 2C:11-3c(4)(c); (2) that the murder occurred
during the commission of an aggravated sexual assault
or kidnapping, N.J.S.A. 2C:11-3c(4)(g); and (3) that
the purpose of the murder was to escape detection or
apprehension, N.J.S.A. 2C:11-3c(4)(f).

Defendant presented substantial mitigating
evidence focusing on his tragic childhood and resulting
emotional disturbance. Pursuant to the "catch-all"
mitigating factor, defendant submitted evidence of
eighteen mitigating circumstances relating primarily to
his flawed upbringing and its effect on his emotional
development and behavior.

Defendant's mitigating evidence demonstrated that
his sixteen-year-old mother drank heavily during her
pregnancy. Defendant was born with heart and
respiratory ailments, and he spent the fifty-four days
following his birth in the hospital. During that period
his parents allegedly visited him only three times.
Because of infectious and other congenital conditions,
defendant was hospitalized on nine other occasions
before his first birthday and required heart surgery
when he was two. Defendant's father was addicted to
alcohol and drugs and was a diagnosed schizophrenic. He
often abused defendant's mother and once broke her arm
in defendant's presence. When defendant was two years
old, his father was imprisoned for raping two of
defendant's older cousins.

Defendant's mother, also an alcoholic, apparently was incapable of providing defendant with normal maternal affection. She disclaimed her maternity, referring to defendant as the child of his paternal grandmother. She was violent and abusive to defendant, on one occasion dangling him out of an apartment window.

When defendant was eight years old, he told his social worker that he wanted to be removed from his home. When he was nine years old, his mother died in an automobile accident. By age eleven, defendant had lived with at least ten different caregivers, including various relatives and foster parents. In many of those placements defendant was exposed to violence and substance abuse.

Several experts testified on defendant's behalf that his sickly and unstable childhood, his exposure to violence, abuse and neglect, and the lack of any affectionate relationship with his mother had reduced his ability to understand cause and effect, limited his capacity to empathize with others, and rendered him hostile, aggressive, and prone to violence. In addition, expert testimony was presented relating defendant's emotional disturbance as an adult to his flawed and oppressive childhood.

The jury unanimously determined that defendant had committed the murder to escape detection, N.J.S.A. 2C:11-3c(4)(f), and had done so in the course of committing aggravated sexual assault and kidnapping, N.J.S.A. 2C:11-3c(4)(g). The jury rejected the State's contention that the murder had involved torture or an aggravated battery. N.J.S.A. 2C:11-3c(4)(c).

Concerning the mitigating factors proffered by defendant:

Some or all of the jurors found the following mitigating factors: (1) that defendant had been denied nurturing as an infant (6 jurors); (2) that he had been born to drug and alcohol-dependent parents (12 jurors); (3) that drinking by his mother during pregnancy had contributed to defendant's physical and developmental disabilities (2 jurors); (4) that his father had abused members of the family when defendant was an

infant, thereby exposing him to violent and
abusive behavior (8 jurors); (5) that his mother
had abandoned him with relatives throughout his
youth (3 jurors); (6) that his mother had
neglected and abused him because of her own
upbringing and dependence on alcohol (10 jurors);
(7) that throughout his childhood, he had been
exposed to excessive amounts of domestic violence
and substance abuse (10 jurors); (8) that he had
suffered through multiple placements and
periodically had attended 11 different schools (10
jurors); (9) that he had been denied consistent
treatment throughout childhood despite
identification of emotional and psychological
problems (3 jurors); (10) that his background had
increased significantly his risk of engaging in
substance abuse and antisocial behavior
(8 jurors); (11) that he had been allowed to abuse
drugs and alcohol at an early age (6 jurors);
(12) that he had begun acting out during his
childhood because of unresolved and untreated
emotional disturbances (6 jurors); (13) that
during his childhood, he had been exposed
periodically to an unstable father (6 jurors);
(14) that he had been deprived of a stable
nurturing home throughout his childhood
(5 jurors); (15) that he had not been provided
with recommended and necessary therapy (4 jurors);
and (16) that the sudden death of his mother had
left him with unresolved grief issues that were
not addressed through therapy (6 jurors).

[Cooper, supra, 151 N.J. at 346, 700 A.2d 306.]

The following two mitigating factors were
unanimously rejected by the jury: (1) that defendant
had been denied exposure to proper role models during
his childhood; and (2) the "any other reasons not
mentioned" factor.

The jury unanimously found that the two
aggravating factors together outweighed the mitigating
factors beyond a reasonable doubt. Accordingly,
defendant was sentenced to death.

State v. Cooper, 159 N.J. 55, 66-68 (1999).  On May 17, 1995,

Petitioner was sentenced to death for the capital murder.  The

trial judge also imposed a consecutive term of 55 years imprisonment with 25 years of parole ineligibility on the kidnapping conviction, and a consecutive term of 20 years imprisonment with ten years of parole ineligibility on the two aggravated sexual assault convictions, which were merged into each other.

On direct appeal, the Supreme Court of New Jersey affirmed the murder conviction and capital sentence, as well as the kidnapping conviction and sentence, but held that the aggravated sexual assault convictions should have been merged into the kidnapping conviction and vacated the aggravated sexual assault conviction and sentence, remanding for entry of an appropriate amended judgment.  State v. Cooper, 151 N.J. 326, 405-07 (1997). The United States Supreme Court denied certiorari.  State v. Cooper, 528 U.S. 1084 (2000).  On the separate proportionality review, the Supreme Court of New Jersey upheld the death penalty. State v. Cooper, 159 N.J. 55 (1999).

Petitioner then filed in the trial court a timely petition for post-conviction relief ("PCR").  Following an interlocutory appeal with respect to discovery issues, see State v. Cooper, 175 N.J. 70 (2002), the PCR court conducted an evidentiary hearing on the issue of whether Petitioner was deprived of his right of allocution in the penalty phase and, on October 16, 2003, dismissed that aspect of the PCR petition.  By order dated

October 24, 2003, the PCR court dismissed the balance of that petition without an evidentiary hearing.

Petitioner appealed as of right to the Supreme Court of New Jersey.  By order dated April 20, 2005, the Supreme Court of New Jersey determined that a more expansive record was required for fair resolution of several of the issues presented and, while otherwise retaining jurisdiction, remanded the matter to the Law Division "for a plenary hearing to explore fully the following issues":

> (1) Whether trial counsel were ineffective because they failed to call Dr. Adams or a substitute expert as a witness at trial to support defendant's contention that the victim's death was accidental and not intentional;
>
> (2) Whether trial counsel were ineffective because they failed to introduce evidence of defendant's intoxication as a defense at trial;
>
> (3) Whether trial counsel were ineffective because they failed to introduce evidence of defendant's mental disease or defect as a defense at trial; and
>
> (4) Whether, in respect of 1, 2, and 3 above, trial counsel had sufficient time to investigate and prepare for trial after the removal of Diane Aifer, Esquire, as counsel for defendant; [and]
>
> (5) Whether additional psychological testing and access to defendant's prison records were necessary for the prosecution of defendant's post-conviction relief petition in light of the earlier August 2001 order (i) requiring production of defendant's prison records from the archives of the New Jersey State Prison and (ii) compelling prison officials to allow entry of Dr. Atkins into the prison for the purposes of evaluating defendant and obtaining prison records in connection with that evaluation[.]

See State v. Cooper, 2009 WL 2778035, *2 (N.J. Super. App.Div. Sept. 3, 2009).  On March 19, 2007, after several days of evidentiary hearings, the PCR court again denied relief. (Answer, Ex. 96.)

On December 16, 2007, the Governor commuted Petitioner's sentence to life imprisonment without the possibility of parole, and on December 17, 2007, the Legislature abolished the death penalty.  As a result, by order dated February 7, 2008, the Supreme Court of New Jersey determined that all issues regarding Petitioner's death sentence had been rendered moot and remanded the case to the Superior Court of New Jersey, Appellate Division, for an initial review of all remaining issues.  State v. Cooper, 194 N.J. 258 (2008).

On September 3, 2009, the Superior Court of New Jersey, Appellate Division, affirmed the denial of post-conviction relief.  State v. Cooper, 2009 WL 2778035 (N.J. Super. App.Div. Sept. 3, 2009), officially published in part, 410 N.J. Super. 43 (N.J. Super. App. Div. 2009).  On January 21, 2010, the Supreme Court of New Jersey denied certification.  State v. Cooper, 201 N.J. 155 (2010).

This Petition followed.  Here, Petitioner asserts the following grounds for relief:  (1) ineffective assistance of trial counsel, for failing to present evidence, during the guilt phase of the trial, that Petitioner suffered from Fetal Alcohol

10

Syndrome (Ground One); ineffective assistance of trial counsel
for suggesting that Petitioner appear before the jury pool,
during the first day of jury selection, dressed in jail clothes
and wearing metal handcuffs and shackles,[2] and abuse of
discretion by the trial court for allowing this appearance
(Ground Two); and denial of the Sixth Amendment right to counsel
of choice.[3]

---

[2] On the first day of jury selection, trial counsel
represented to the trial judge that the civilian clothes obtained
for Petitioner were too big, that Petitioner had torn one pair of
pants, and that Petitioner had said that he didn't care and he
was just going to go in his prison garb.  Trial counsel advised
the trial court that they were willing for Petitioner to appear
in prison garb and that they would attempt to obtain properly-
fitting clothes for the next day.  The trial court then had
Petitioner brought into court in his prison clothing.  Petitioner
then absented himself from jury selection for several days, later
appearing in civilian clothing.  (Answer, Exs. 10 at 3, 13 at 3,
16 at 3, 22 at 11-12.)

Petitioner asserts that he was never told that he had the
option to refuse to appear in prison clothing and to request an
adjournment until properly-fitting clothes could be obtained.

There is no evidence that Petitioner was restrained.  (Ex.
L, Appendix ("Appendix") to Defendant's Brief to Supreme Court on
Appeal from Order Dismissing Motion for Post-Conviction Relief,
First Amendment to Verified Petition for Post-Conviction Relief,
at 17a-20a (no mention of physical restraints); Ex. M,
Certification of David Cooper, Appendix at 300a-301a (no mention
of physical restraints).

[3] Petitioner has withdrawn his fourth ground for relief,
that one of the Supreme Court justices who acted on his petition
for certification should have recused himself.  (Response to
Answer, Docket Entry No. 18, at 17-18.)

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an

unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL

13

1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).  In such instances, "the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA."  Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) (citing McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999)).  "However, § 2254(e)(1) still mandates that the state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence."  Simmons v. Beard, 581 F.3d q158, 165 (3d Cir. 2009).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent."  Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v.

Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### III.  ANALYSIS

#### A.   Ineffective Assistance of Trial Counsel

Petitioner argues that his trial counsel failed to provide effective assistance in two particulars: failing to present evidence of fetal alcohol syndrome during the guilt phase[4] and suggesting that he appear in prison garb and, possibly, shackles, on the first day of jury selection.[5, 6]

---

[4] Under New Jersey law, evidence that a defendant suffered from a mental disease or defect is admissible to prove "that the defendant did not have a state of mind which is an element of the offense."  See N.J.Stat.Ann. 2C:4-2.  Evidence of a mental disease or defect may warrant a charge on diminished capacity where such evidence could negate the "knowing" and "purposeful" elements of murder.  See State v. Moore, 113 N.J. 239, 287-88 (1988).

[5] This Court does not construe the Petition as asserting that Petitioner was deprived of effective assistance of counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  <u>Strickland</u> at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687.  "When a defendant challenges a conviction, the

---

by the replacement of his public defender after the start of jury selection.  To the extent the Petition could be so construed, however, the Court notes that the Appellate Division addressed that claim in the context of Petitioner's other "ineffective assistance" claims, and will, for the sake of completeness and to set the context for Petitioner's claim of deprivation of counsel of choice, note in this discussion the Appellate Division's treatment of that claim.

[6] This Court disagrees with Respondents' contention that Petitioner has failed to exhaust some of his claims of ineffective assistance of counsel.

16

question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland. See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

Both the PCR court, following an evidentiary hearing, and the Appellate Division exhaustively analyzed Petitioner's claims of ineffective assistance of counsel and found them meritless.

III.

Defendant claims that he was denied the effective assistance of counsel at both the guilt and penalty phases of his trial. ... "To establish a prima facie claim of ineffective assistance of counsel, a defendant must demonstrate a reasonable likelihood of succeeding under the test set forth in Strickland v. Washington," 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed.2d 674 (1984), adopted in New Jersey in State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987). ...

There is no dispute that defendant had a constitutional right to the effective assistance of trial counsel, during both the guilt and penalty phases, and to effective assistance of appellate counsel. Evitts v. Lucey, 469 U.S. 387, 395-96, 105 S.Ct. 830, 836, 83 L. Ed.2d 821, 830 (1985); United States v. Cronic, 466 U.S. 648, 653-55, 104 S.Ct. 2039, 2043-44, 80 L. Ed.2d 657, 664-65 (1984); ... However, in evaluating a claim of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential," Strickland, supra, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L. Ed.2d at 694, and we must give substantial deference to the trial judge's findings of fact on the issue if they are supported by the record. ...

Decisions as to trial strategy or tactics are virtually unassailable on ineffective assistance of counsel grounds:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

[Strickland, supra, 466 U.S. at 690-91, 104 S.Ct. at 2066, 80 L. Ed.2d at 695.]

...

It is well known that to establish a claim of ineffective assistance of counsel, defendant must prove two elements. First, defendant must prove that, with respect to some specified issue, counsel's performance was deficient in that it "fell below an objective standard of reasonableness." Strickland, supra, ... . Second, he must prove prejudice, defined as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694 ... .

Before abolition of the death penalty, L. 2007, c. 204, the Strickland/Fritz standard applied to capital trials, albeit "with some adjustment." State v. Chew, 179 N.J. 186, 204, 844 A.2d 487 (2004). As to both phases of capital trials, the first element of the Strickland/Fritz analysis, deficiency of counsel's performance, was adjusted to account for the expectation that capital counsel would have expertise in the unique issues presented in capital cases. Ibid. ... . The second prong of the Strickland/Fritz analysis, prejudice, was not altered for the guilt phase, while "a less demanding prejudice-prong standard" was applied to the penalty phase. Ibid. To prove ineffective assistance of counsel in the penalty phase of a capital trial resulting in death, a defendant was required to establish both that counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." Marshall, supra, 148 N.J. at 250, 690 A.2d 1. ... This "equates with 'a probability sufficient to undermine confidence in the outcome.'" Marshall, supra, 148 N.J. at 250, 690 A.2d 1 (quoting Strickland, supra, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L. Ed.2d at 698).

The reason for applying the "less demanding" prejudice-prong standard to the penalty phase was "the unique function and responsibility" of a capital jury, which had broad discretion "in deciding between life and death," as well as "the realistic limitations on appellate review of jury penalty-phase deliberations."

Marshall, supra, 148 N.J. at 248-51, 690 A.2d 1. In
other words, a less stringent standard was applied
because "death is different." Gregg v. Georgia, 428
U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L. Ed.2d 859,
883 (1976).

Because of the principles applicable when this
case was tried and the fact that defendant is now
serving life imprisonment without parole as a result of
the verdict which resulted in the imposition of capital
punishment, we continue to apply those standards in
this case. Based on those standards, we find that the
record supports the conclusions of Judge Ira Kreizman
in denying PCR.

IV.

We explore the issues warranting discussion in a
written opinion and summarily reject any others. R.
2:11-3(e)(2). We first address issues in common to both
phases of the trial, and thereafter those unique, or
more related, to the guilt phase and penalty phase
respectively. We start, however, with a description of
the evidentiary basis for the claims as developed at
the PCR hearing.

In addition to specific claims of ineffective
assistance, defendant asserts that he was denied the
effective assistance of counsel because of the removal
of Diane Aifer as his trial counsel shortly before the
trial began.[FN5] Aifer was the head of the Monmouth
Regional office of the Public Defender's Office when
defendant was arrested in July 1993. Aifer assigned
herself to work on defendant's case together with David
Donnelly and staff investigators. Donnelly was admitted
to practice in 1966, and he had been employed in the
Public Defender's office since 1982.

FN5. The evidentiary hearing on this issue
followed the Supreme Court's remand order.

Aifer and Donnelly divided the work on the various
aspects of defendant's case. Donnelly was essentially
to handle the guilt phase, and Aifer was principally
responsible for developing the evidence, including
expert evidence, to be presented during the penalty
phase. However, some of the expert evidence she
developed was also relevant to the guilt phase. For

20

example, evidence to contradict expected testimony of the medical examiner regarding the intentional nature of the victim's death was relevant to both phases. In the guilt phase, Aifer also was responsible for addressing the DNA evidence, and she was expected to cross-examine the medical examiner.

Before defendant's case, Aifer had tried "several dozen" noncapital criminal cases, and she had worked on three other capital cases. She had also consulted on another capital case that was resolved as a noncapital case, and she had received training on the handling of capital cases. Donnelly was also an experienced criminal defense attorney and had prior experience on one capital case in which he had worked with Aifer.

Jury selection began on January 30, 1995. By that time, Aifer had been gathering evidence for use in the penalty phase and developing theories for the presentation of mitigating evidence. She had obtained a social history report and several psychological evaluations of defendant prepared by experts. However, her work was not complete, particularly with respect to development of the issue of fetal alcohol syndrome (FAS), a subject to be discussed at length hereinafter. She planned to continue working on her investigation through jury selection, and she believed she would have sufficient time to complete her work because she did not believe that the trial, "or the penalty phase certainly," would begin until "two to three months" after jury selection had begun.

On February 9, 1995, Aifer resigned from the Public Defender's Office as a result of a dispute with her supervisors in Trenton. She believed that the Public Defender "had absolutely no confidence in [her] ability to handle the capital case." At the time Aifer resigned, jury selection was ongoing. She continued with jury selection in the days after February 9, pending resolution of motions related to her removal as an attorney for defendant.

The Public Defender moved to relieve Aifer as counsel, and for a stay of trial for ninety days, which the State opposed. On February 14, 1995, the trial court denied both motions. The Public Defender then moved before this court for leave to appeal and for a stay of jury selection and trial. According to

Donnelly, the goal was "to buy as much time" as possible for Aifer's replacement to familiarize himself with the case. The defense asked for ninety days, but Donnelly "was hoping" to get between forty-five and sixty. We granted leave to appeal and relieved Aifer as defendant's counsel. However, we declined to stay jury selection. Rather, we stayed the commencement of the guilt phase for thirty days following conclusion of the jury selection process and before the jury was sworn, "to allow defense counsel adequate time to prepare for the guilt and penalty phases of the trial."

The State then filed a motion with the Supreme Court for leave to appeal, to challenge the removal of Aifer as defendant's counsel and the resulting stay of the trial. Defendant, through the Public Defender, opposed the motion and the Supreme Court denied it.

John McMahon was assigned as Aifer's replacement, with the division of responsibilities between Donnelly and McMahon as they had been between Donnelly and Aifer. McMahon was to work on the penalty phase of the trial. He was relieved of responsibility for his other caseload. In addition, Steven Kirsch was assigned to work on any appellate legal issues that arose. Both McMahon and Kirsch are known to us as exceptional attorneys who practice full-time with the Public Defender.

McMahon was admitted to practice in 1989 and began working in the Public Defender's Office in 1990. Prior to defendant's case, he had worked on only one capital case that actually went to trial. His role in that case had been to prepare the guilt phase.

McMahon began working on defendant's case immediately after his assignment in February 1995. He spoke with Aifer and, with the assistance of a volunteer intern, organized Aifer's files and became familiar with them. He also met defendant, worked with the assigned investigators, requested additional resources, and contacted both expert and fact witnesses. McMahon was present on all days of jury selection after his assignment, between February 21 and March 21, 1995.

After jury selection, pursuant to our order, there was a thirty-day adjournment of the proceedings to

22

permit defense counsel to prepare for trial. During that period, McMahon worked with the "mitigation specialist," prepared "mitigation materials," and worked to "get the witnesses lined up." He met with the defense experts Aifer had retained, and he retained additional experts as well. He also participated to some degree in Donnelly's preparation of the guilt phase witnesses. In particular, he worked with Donnelly to retain Dr. John Adams, whom the defense planned to call as a guilt phase witness regarding the cause of the victim's death. McMahon expected that Adams's testimony would also be relevant in the penalty phase.

On April 24, 1995, at the end of the thirty-day period, the guilt phase commenced. McMahon believed he was present at all guilt phase proceedings. Donnelly could not recall if McMahon had been present on all days. McMahon cross-examined one witness during the guilt phase, and continued to gather evidence for use during the penalty phase.

The guilt phase was completed after six trial days, on May 2, 1995, and the penalty phase began six days later, on May 8-three months after McMahon was assigned to the case. He had devoted his time exclusively to the case following his assignment.

During the penalty phase, defense counsel made a strategic decision to limit the presentation of mitigating evidence to the time before defendant's eighteenth birthday, in order to focus on defendant's experiences as a child. The record reflects that defendant had a terrible childhood, which included parents and caregivers who were addicted to alcohol and other drugs, and who were physically, sexually, and verbally abusive. He did not have a stable home life; he constantly was moved between family members and foster care placements in New Jersey, Florida, and Pennsylvania. Defendant's alcoholic mother died when he was about nine years old, and his alcoholic and violent father was in and out of prison. He also suffered from physical disabilities relating to his premature birth. At an early age, he developed psychological, emotional, and behavioral problems, became addicted to alcohol and drugs, and got into trouble with the law. State v. Cooper, supra, 151 N.J. at 345, 700 A.2d 306 and Cooper, supra, 159 N.J. at 66-68, 731 A.2d 1000.

Defendant's legal expert on PCR, Carl Herman, is an attorney experienced in capital litigation. Herman believed that defense counsel's performance was adequate in the guilt phase, but ineffective in the penalty phase of the trial. He believed that defense counsel did not have sufficient time to prepare for the penalty phase, particularly to obtain the necessary experts on fetal alcohol syndrome and mental disease or defect. In addition, he believed that counsel erred by limiting the penalty phase evidence to events before defendant's eighteenth birthday, by not addressing the mitigating factor of intoxication, and by not calling a physician to challenge the medical examiner's testimony about the length of time the victim suffered.

According to Herman, the penalty phase was the most significant phase of defendant's trial because "frankly ... they were going to lose" the guilt phase. The evidence of defendant's guilt was "[v]ery powerful ... including his own confession." Thus, "there was no way they were going to win the guilt phase of the case. Mr. Cooper was going to be convicted no matter what Mr. Donnelly did...."

The sole defense presented during the guilt phase of trial was that defendant had accidentally, and not purposefully or knowingly, killed the victim. As the Supreme Court noted on defendant's direct appeal:

At trial, the defense conceded defendant's guilt of felony murder, kidnapping, and aggravated sexual assault. The defense contested, however, that the murder was purposeful or knowing. Instead, defendant contended that the killing had occurred accidentally during the course of an aggravated sexual assault. Thus, he claimed that there had been no intent to strangle the child but rather that death had been caused by unintentionally placing pressure on her carotid artery for about thirty seconds.

[Cooper, supra, 151 N.J. at 342, 700 A.2d 306.]

The basis for this defense was the contents of defendant's confession, in which he maintained that the

24

victim's death was an accident. Id. at 343, 731 A.2d
1000. ...

   As we have noted, in his testimony, defendant's
legal expert, Herman, opined that the guilt phase
verdict was not adversely affected by counsel's failure
to call an expert witness on the issue of accidental
death. A guilty verdict was virtually assured because
defendant had confessed to the crime, and the evidence
of his guilt was very strong. In Herman's words:

     I can't say that the guilt phase performance was
     deficient. I can't imagine even if they presented
     the testimony of Dr. Spitz or Dr. Adams that it
     probably would have made a big difference in the
     jury's minds. It's possible. But I'm not relying
     on that. And I wouldn't say I don't think the
     guilt, the outcome of the guilt phase would have
     been different had they presented this type of
     testimony. I think it would be helpful and there
     would have been some carryover in the penalty
     phase, but I don't have any fault with them,
     particularly in the guilt phase.

   Defense counsel did not present an intoxication
defense in the guilt phase. Nor did they pursue
defendant's intoxication at the time of the crime as a
mitigating factor in the penalty phase. See N.J.S.A.
2C:11-3(c)(5)(d) (repealed Dec. 17, 2007, L. 2007, c.
204). At the PCR hearings, Donnelly and Aifer testified
that, immediately upon their assignment to the case,
they investigated all aspects of defendant's life.
Among the issues they investigated were defendant's
intoxication at the time of the crime, and his history
of alcoholism and drug dependency. Ultimately, based
upon the expert evidence they developed, Donnelly,
Aifer, and McMahon all concluded that an intoxication
defense was unsupportable.

   At counsel's request, psychologist Dr. Frederick
Rotgers evaluated defendant before trial and issued a
report dated July 7, 1994. There was no scientific
evidence establishing defendant's level of intoxication
at the time of the crime. Therefore, Rotgers was forced
to rely upon anecdotal evidence. Rotgers concluded
"within a reasonable degree of professional certainty,"
that defendant's blood alcohol level at the time of the
offense would have rendered him "legally intoxicated."

However, according to Aifer, Rotgers also concluded that defendant's faculties were "probably not" impaired by his level of intoxication "because of his extensive abuse of alcohol from a very, very early age." Therefore, defendant's intoxication was "not sufficient ... to diminish or eliminate his capacity to form the requisite mental states of culpability for the offenses with which he is charged." See State v. Cameron, 104 N.J. 42, 53-54, 514 A.2d 1302 (1986).

Rotgers further concluded that, based upon defendant's ability to provide a "clear, unqualified and lucid account" of his interrogation, it was "unlikely" that defendant was significantly impaired at the time of his arrest and his statement to police. Therefore, his level of intoxication did not prevent him from "understand[ing] or knowing[ly] and voluntarily waiv[ing] his Miranda rights prior to giving his statement to the police investigators."

Rotgers' conclusions were consistent with the PCR testimony of John Musiello, John Dyott, and Valerie Hussein, detectives employed or formerly employed by the Monmouth County Prosecutor's Office. These witnesses stated that, at the time of his arrest and interrogation, defendant did not smell of alcohol, did not appear to be under the influence of alcohol or any other drug, and was able to give a clear and consistent description of his activities on the date of the crime.

At the PCR hearings, defense counsel did not present any testimony or argument that took issue with trial counsel's failure to pursue an intoxication defense in the guilt phase. Rather, they pursued an argument that trial counsel had erred by not pursuing intoxication as a mitigating factor in the penalty phase. In this regard, they presented the testimony of Dr. Robert Pandina, "an expert in developmental neuropsychology and psychopharmacology with an expertise in the effects of alcohol on human physiology and human behavior." Pandina agreed with Rotgers that defendant's blood alcohol level at the time of the offense would have been approximately .17 percent. At that level of intoxication, defendant would have been impaired, but not significantly so, and his past alcohol abuse would have prevented him from feeling his impairment. Therefore, Pandina agreed with Rotgers that defendant's intoxication would not have diminished his

culpability for his crimes. However, he believed it
would have been relevant to mitigation during the
penalty phase in conjunction with "potential functional
deficits resulting from fetal alcohol exposure," an
issue to which we now turn.

In their investigation of defendant's life
circumstances in advance of trial, counsel considered
whether defendant's culpability for his crimes should
be diminished, or whether his punishment should be
mitigated, as a result of fetal alcohol syndrome or
some other mental disease or defect. In pursuit of such
claims, Aifer arranged for defendant to be evaluated by
multiple psychological and psychiatric experts,
including Rotgers, who had analyzed the intoxication
defense, and Drs. Jonathan Willard-Mack and Robert
Sadoff.

Rotgers evaluated defendant and issued reports
dated December 2, 1994 and April 21, 1995. He also
issued an updated report in 2001 with respect to the
petition for PCR. In his 1995 report, Rotgers concluded
that defendant suffered from "impaired frontal lobe
functioning," which resulted in difficulty engaging in
higher order executive functioning, including cognitive
flexibility and adjusting one's behavior to changing
external circumstances. He suggested that, given
defendant's history, he may have "suffered, either
prenatally as a result of fetal alcohol exposure or as
a result of his heart condition, subtle cerebral damage
that has reduced brain functioning...."

Rotgers advised defense counsel to consider fetal
alcohol effects as a possible diagnosis. However, he
could not testify to that issue because it was beyond
his area of expertise. He opined that defendant's
cognitive deficits were consistent with antisocial
personality disorder with borderline traits, albeit
with some possible relationship between that diagnosis
and fetal alcohol exposure. He stated:

It seems likely that some of the behavior
that forms the basis of the Axis-II [Antisocial
Personality Disorder with Borderline Traits]
diagnosis is due to neurological dysfunction
resulting from prolonged substance use, early
cerebral anoxia, and possible fetal alcohol
effects. Thus, this may be more correctly

27

categorized as a Personality Change Due to a
General Medical Condition. That would clearly be
the diagnosis if a structural neurological basis
for the cognitive deficits documented by
neuropsychological screening is found.

In the December 1994 report, Dr. Rotgers
recommended "[a] SPECT [Single Photon Emission Computed
Tomography] or other sophisticated brain imaging
assessment [be conducted] to clarify any structural
deficits...."

Dr. Willard-Mack evaluated defendant and issued a
report dated January 10, 1995. He concluded that
defendant was "an extremely psychologically disturbed
individual," suffering from numerous psychiatric
disorders including substance abuse and dependence, a
personality disorder, and depression, which made him
"prone to poorly controlled and poorly modulated
violent, angry and impulsive behavior." He also
believed that defendant suffered from "a mild, diffuse,
static encephalopathy" and suggested "the possibility
of brain damage due to fetal exposure to alcohol." Like
Rotgers, he suggested that a brain scan might be
helpful in assessing defendant's condition.

Upon these recommendations, Aifer made efforts to
obtain a PET scan of defendant's brain. Ultimately,
however, only a SPECT was performed. The SPECT was
performed in April 1995, after McMahon's assignment to
the case, and it demonstrated "very small, subtle focal
areas" of decreased brain activity of uncertain
etiology. "Correlation with a CT and/or a MRI" was
recommended. McMahon did not pursue a PET scan, nor did
he pursue an MRI or a CT scan, although he could not
recall why. He stated that it may have been a tactical
decision, or it may simply have been a function of lack
of time.

Willard-Mack stated that the SPECT confirmed "the
presence of a cognitive disorder, not otherwise
specified, secondary to chronic, developmental brain
injury." He believed that this was an issue to be taken
into consideration as a mitigating factor weighing
against a death sentence.

In a revised report, dated January 24, 2002, and
prepared in the context of the PCR hearings,

28

Willard-Mack diagnosed defendant as suffering from a cognitive disorder. In his 2002 opinion, he also went much further than he had in his pretrial report, concluding that defendant's mental disorder related not only to the mitigating factors but also to his guilt or innocence of the crimes. In this regard, Willard-Mack concluded:

> In addition to mitigating factors, the neurological diseases of the brain, in combination with intoxication at the time of the crime in question, raise the issue that [defendant] may well have met the criteria for diminished capacity for the murder in question due to not fully knowing the nature of his criminal acts due to the combined effects of brain damage and drug and alcohol intoxication.

In his earlier 1995 report, Willard-Mack had not issued any such diagnosis or conclusion.

Finally, Dr. Robert Sadoff, a psychiatrist, also evaluated defendant, and issued a report to the defense on January 23, 1995. Sadoff noted Willard-Mack's finding that defendant suffered from "a mild encephalopathy." Nevertheless, Sadoff concluded that there was "[i]nsufficient evidence to support a diagnosis of fetal alcohol syndrome," although he believed that "clearly" defendant was "affected by" his mother's drinking "and the unstable life that he was exposed to."

In Sadoff's opinion, defendant's psychological problems and his intoxication at the time of the offense were relevant to the mitigating factors and thus the penalty phase of defendant's trial. However, they did not affect defendant's "capacity to conform his conduct to the requirements of the law ... sufficient to constitute a defense to prosecution," and thus they were not relevant to the guilt phase of his trial.

Ultimately, based upon these experts' conclusions on the issue of mental disease or defect, Aifer determined that there was no viable diminished capacity defense to defendants' crimes. However, at the time she was relieved from the case, Aifer intended to continue pursuing the issue of fetal alcohol syndrome because,

although the experts were unable to diagnose the syndrome, they all agreed that defendant had been affected by his mother's alcohol abuse.

Picking up on Aifer's work, McMahon pursued the issue of fetal alcohol syndrome for purposes of mitigation. However, the experts he contacted either could not work with him in the limited time frame available, or they could not support a fetal alcohol syndrome diagnosis. In the end, defense counsel did not present any evidence regarding defendant's brain damage or neurological deficits caused by fetal alcohol syndrome or otherwise, believing they had achieved enough through their cross-examination of Dr. Michals.[FN8]

FN8. Dr. Rotgers attended Michals' testimony and helped frame the cross-examination.

At the PCR hearings, defendant took issue with trial counsel's failure to adequately pursue the issue of fetal alcohol syndrome. He called numerous witnesses who testified to the likelihood that defendant suffered from the syndrome, and to the fact that trial counsel had erred in not calling witnesses on the subject. We shall develop the evidence presented at the PCR hearing in the relevant portion of the opinion.

V.
A.

Defendant argues that the Public Defender denied him effective assistance of counsel by removing Aifer as his attorney in the midst of jury selection, without his knowledge or consent, and substituting McMahon without demanding an adjournment of sufficient length to prepare adequately for the penalty phase of the case, particularly because, at the time of Aifer's removal, her investigations and preparations were incomplete.

According to defendant, as a result of McMahon's relative inexperience at the time, he pursued an uninformed mitigation strategy which focused exclusively on defendant's life up to the age of eighteen, and this strategy precluded consideration of the statutory mitigating factor of defendant's intoxication at the time of his offense. Defendant

further contends that McMahon had insufficient time to
develop significant areas of mitigation evidence,
including defendant's fetal alcohol syndrome and brain
damage, and the sexual abuse he suffered as a child.
According to defendant, McMahon should have requested a
continuance when he became aware of how much work still
needed to be done in advance of the penalty phase.[FN9]

> FN9. We reject the State's "invited error"
> argument premised on the Public Defender's refusal
> to permit Aifer to remain in the case after her
> resignation and defendant's opposition to the
> State's endeavor to oppose her removal. According
> to the State, Aifer's removal from the case
> constitutes "invited error," something defense
> counsel aggressively pursued and succeeded in
> obtaining. The issue of Aifer's representation was
> decided by the Public Defender independent of
> defendant, and he can now raise the issue even
> though his trial counsel, assigned by the Public
> Defender, did not. In any event, defendant's claim
> is premised on the quality of representation he
> actually received from the attorneys that
> ultimately represented him.

Judge Kreizman found that defendant was not denied
effective assistance of counsel as a result of Aifer's
removal from the case. He found that "counsel had
sufficient time to explore intoxication as a defense,
and whether the death was accidental or
non-intentional." He concluded that additional time
would not have resulted in any credible expert willing
to testify in defendant's favor on either of those
subjects, and defense counsel's failure to call their
available witnesses on these subjects did not affect
the outcome of the case. In this regard, Judge Kreizman
noted the amount of effort and resources Aifer and
Donnelly had put into the case before Aifer resigned,
stating:

> It must be understood that this was not a capital
> murder case where a defense team was ordered to
> trial quickly and without sufficient time to
> adequately prepare. Monmouth County Public
> Defenders' office geared up early for this trial.
> The attorneys were assigned almost immediately
> upon defendant's arrest. Ms. Aifer and Mr.
> Donnelly embarked on a plan to create an effective

31

defense, realizing at an early date that this
would be a case where it was almost a certainty
that the penalty phase would be reached. They
spared no expense in hiring experts, collecting
all of defendant's biographical and medical
information, located and interviewed relatives and
friends of defendant. They used their
investigators, their Appellate Division counsel
and all of their resources of the office.

They agreed on a strategy as to how to
proceed in both the guilt and penalty phases. They
even used the focus group to try out their trial
philosophy and tactics. They really left no stone
unturned. Defendant was interviewed, consulted
throughout.

Finally, the judge concluded that defendant was
not prejudiced by counsel's not having developed and
presented evidence on fetal alcohol syndrome or mental
disease or defect in either phase of the trial because
an expert on that issue would not have affected the
result. As we will hereinafter develop at length with
respect to defendant's petition for PCR concerning the
penalty phase, although there was substantial evidence
at the PCR hearing that defendant suffered from fetal
alcohol syndrome, Judge Kreizman concluded that there
were "no demonstrable physical irregularities in Mr.
Cooper's brain" resulting from the syndrome. Finally,
Judge Kreizman noted that, even without evidence of
fetal alcohol syndrome in particular, the jury had been
presented with a great deal of information regarding
defendant's life, including the tragic effects of his
pre- and post-natal exposure to alcohol. However, that
evidence had not swayed the jury to a non-death
sentence.

We reject the suggestion that Aifer's removal from
the case warrants reversal of either the conviction or
penalty phase disposition. We are satisfied that the
replacement of Ms. Aifer did not result in the
deprivation of the effective assistance of counsel.
First, as to the guilt phase, there is no dispute that
it was going to be handled principally by Mr. Donnelly,
and Mr. Donnelly testified that he asked for more time
than needed to replace Ms. Aifer. He was given thirty
days after jury selection was concluded before the
trial was commenced. Ms. Aifer was focusing on death

32

penalty issues designed to spare defendant's life. Even defendant's expert, Carl Herman, could not find a basis for supporting defendant's claim of ineffective assistance at the guilt phase.

We add only that the Public Defender represented defendant and, in the absence of prejudice, had the right to substitute counsel before the jury was sworn and empanelled. <u>See</u>, <u>e.g.</u>, <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165 L. Ed.2d 409, 416 (2006) (discussing "right of a defendant who does not require appointed counsel to choose who will represent him."); <u>State ex rel. S.G.</u>, 175 N.J. 132, 141, 814 A.2d 612 (2003). In any event, the real issue in determining whether defendant was deprived of the effective assistance of counsel must relate to the assistance he actually received. As to that, we find that Mr. McMahon, like Mr. Donnelly, cannot be faulted for his defense of a matter that involved the sexual assault and death of a six-year-old.

B.

We reject the contentions that defendant's conviction and penalty verdict must be reversed because he appeared before the jury in prison clothes, and counsel was ineffective for not preparing him to appear in civilian clothes that fit him.[FN10]

> FN10. There appears to be no contest that defendant was observed by jurors in his prison clothing or jumpsuit during some part of the jury selection. By virtue of the individual voir dire in a capital case, those jurors were told defendant was facing the death penalty and, therefore, would undoubtedly believe he was in prison at the time. <u>See</u> <u>Cooper</u>, <u>supra</u>, 151 N.J. at 351-53, 700 A.2d 306; R. 1:8-3(a).

We bypass any issue of waiver and lack of compulsion, and note that the issue of such an appearance could have been raised on the direct appeal. See R. 3:22-4. <u>See generally</u> <u>State v. Artwell</u>, 177 N.J. 526, 533-34, 832 A.2d 295 (2003). We have not the slightest doubt that any reasonable juror would have expected defendant to be incarcerated while on trial for capital murder.

<u>State v. Cooper</u>, 2009 WL 2778035, *6-*18 (N.J. Super. App.Div.
Sept. 3, 2009).

In its further discussion of Petitioner's claims of
ineffective assistance during the penalty phase of the trial, the
Appellate Division set forth in great detail the testimony of
competing experts presented at the PCR hearing regarding fetal
alcohol syndrome, concluding that Petitioner had failed to
establish that there was a reasonable probability that the
deliberations -- regarding either guilt or penalty -- would have
been affected substantially if the omitted evidence had been
presented, that is, that Petitioner had failed to meet the second
prong of the <u>Strickland</u> test.  2009 WL 2778035 at *24-*30.

This Court finds that the decision of the Appellate
Division, with respect to those claims of ineffective assistance
of trial counsel that were addressed on the merits, is neither
contrary to nor an unreasonable application of the <u>Strickland</u>
standard, nor is the decision based on an unreasonable
determination of the facts in light of the evidence presented in
state court.

With respect to Petitioner's claim of ineffective assistance
based on the decision to permit him to appear before the jury in
prison garb, the state court determination that the claim was
procedurally barred precludes this Court from granting relief.

A procedural default occurs when a prisoner's federal
claim is barred from consideration in the state courts

34

> by an "independent and adequate" state procedural rule.
> See, e.g., Doctor[ v. Walters, 96 F.3d 675, 683 (3d
> Cir. 1996)].  Federal courts may not consider the
> merits of a procedurally defaulted claim unless the
> applicant establishes "cause" to excuse the default and
> actual "prejudice" as a result of the alleged violation
> of the federal law or unless the applicant demonstrates
> that failure to consider the claim will result in a
> fundamental "miscarriage of justice." Coleman v.
> Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115
> L.Ed.2d 640 (1991).

Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002).

On habeas review of state prisoner claims, a federal court "will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" Coleman, 501 U.S. at 734-35 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).[7]  Only a "firmly established and regularly followed state practice" is adequate to prevent subsequent habeas review in federal court. James v. Kentucky, 466 U.S. 341, 348-351 (1984).  See also Lee v. Kemna, 534 U.S. 362, 376 (2002) ("Ordinarily, violation of 'firmly established and regularly followed' state rules ... will be adequate to foreclose review of a federal claim." (citations

---

[7] A state court's reliance on a procedural bar as an alternate holding is sufficient to trigger the "cause" and "prejudice" test.  See United States ex rel. Caruso v. Zelinsky, 689 F.2d 435, 440 (3d Cir. 1982).

omitted)).  Generally speaking, "[a] state court's refusal to address a prisoner's federal claims because he has not met a state procedural requirement is both independent and adequate." Cabrera v. Barbo, 175 F.3d 307, 312 (3d Cir. 1999) (citations omitted).

The "cause" standard requires a petitioner to show that some objective factor external to the defense impeded his efforts to comply with the state procedural rule.  See Coleman, 501 U.S. at 752 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  In the absence of a Sixth Amendment violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.  Coleman, 501 U.S. at 754.  Neither a pro se prisoner's ignorance of the procedural rule nor inadvertence satisfies the cause standard.  Murray at 485-87.  Failure of the state court to "bend the rules" for a pro se litigant is not cause.  Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir. 1992).

To establish "prejudice," a petitioner must prove "'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension.'"  Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

36

In the alternative, in order to establish that failure to review an otherwise procedurally defaulted claim will result in a "miscarriage of justice," a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 496. "Thus, to establish a miscarriage of justice, the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him." Werts, 228 F.3d at 193 (citing Schlup v. Delo, 513 U.S. 298, 326 (1995)).

Case law suggests that Rule 3:22-4 is a "firmly established and regularly followed state practice." The notable exception involves claims of ineffective assistance of counsel that depend upon facts not appearing in the record. See, e.g., Cabrero v. Barbo, 175 F.3d 307, 312-14 (3d Cir. 1999) (dicta). That exception does not apply, here, however, because the Appellate Division held that Petitioner could have asserted, in earlier proceedings, the ineffective assistance of counsel claim asserted here arising out of Petitioner's appearance in prison garb. Thus, the PCR court denied relief on an independent and adequate state ground, precluding review here of Petitioner's remaining claims unless he can meet the "cause" and "prejudice" standard or demonstrate that failure to consider the claims will result in a miscarriage of justice.

Here, Petitioner has failed to establish cause and prejudice for his procedural default and there is no reason to conclude that failure to consider the claim would result in a fundamental miscarriage of justice.  Petitioner attempts to bolster his assertion of "fundamental miscarriage of justice," under the Carpenter standard, by claiming that he appeared not only in prison garb but also in handcuffs and/or shackles.  Cf., e.g., Deck v. Missouri, 544 U.S. 622 (2005) (Due Process Clause prohibits routine use of physical restraints visible to jury during guilt phase of criminal trials).  Careful review of the record, however, reveals that Petitioner failed to establish in state court that he was so restrained.  Indeed, he failed even to unambiguously assert that he was so restrained, as long as fourteen years after his conviction.  (Answer, Ex. Y, Defendant's Petition for Certification in the Supreme Court of New Jersey, dated October 5, 2009, at 18, without citation, "the transcript suggests that he may have been brought before the full panel in shackles as well".)  It is too late for Petitioner credibly to establish here that he was shackled.

> If the applicant has failed to develop the factual
> basis of a claim in State court proceedings, the
> [federal] court shall not hold an evidentiary hearing
> on the claim unless the applicant shows that --
>
> (A) the claim relies on --
>
> (i) a new rule of constitutional law, made
> retroactive to cases on collateral review by

the Supreme Court, that was previously
unavailable; or

(ii) a factual predicate that could not have
been previously discovered through the
exercise of due diligence; and

(B) the facts underlying the claim would be
sufficient to establish by clear and convincing
evidence that but for constitutional error, no
reasonable fact-finder would have found the
applicant guilty of the underlying offense.

28 U.S.C. § (e)(2). Having failed to establish in state court

that he was shackled when brought before the jury on the first

day of jury selection, Petitioner cannot now expand the record.[8]

---

[8] In any event, the claim is meritless. "The law has long
forbidden routine use of visible shackles during the guilt phase;
it permits a State to shackle a criminal defendant only in the
presence of a special need." Deck v. Missouri, 544 U.S. 622,
626-29 (2005) (citing Estelle v. Williams, 425 U.S. 501 (1976)
and Illinois v. Allen, 397 U.S. 337 (1970) (recognizing that a
criminal defendant is prejudiced when he appears before the jury
in shackles during entire trial)). Nevertheless, where a court,
without adequate justification, orders a defendant to wear
shackles that will be seen by a jury, the error is subject to
harmless-error analysis pursuant to Chapman v. California, 386
U.S. 18, 24 (1967). Id. at 635. See also United States v.
Salehi, 2006 WL 1759855 at *13-14 (3d Cir. June 28, 2006).

Numerous courts, moreover, have distinguished the situation
in which a criminal defendant in shackles while being transported
is briefly observed by jurors, generally finding such encounters
harmless. See, e.g. , U.S. v. Lattner, 385 F.3d 947 (6th Cir.
2004), cert. denied, 543 U.S. 1095 (2005); United States v.
Olano, 62 F.3d 1180, 1190 (9th Cir. 1995); Wright v. Texas, 553
F.2d 185 (5th Cir. 1976).

Here, there is no suggestion that Petitioner was shackled
during the entire trial; rather, the suggestion is that he was
seen in shackles in the courtroom during some portion of the
first day of jury selection. In light of the overwhelming
evidence of Petitioner's guilt, this Court can discern no
prejudice resulting from any fleeting appearance in shackles.

To the extent the state court's refusal to consider the ineffective-assistance claim based upon Petitioner's appearance in court in prison garb might not be based upon an independent and adequate state ground, it is nevertheless meritless.  As noted by the Appellate Division, any "reasonable juror" would have expected Petitioner to have been incarcerated while on trial for capital murder.

For all the foregoing reasons, Petitioner is not entitled to relief on his claims of ineffective assistance of trial counsel.

B.   Trial Court Discretion Regarding Appearing in Jail Clothes

Petitioner asserts that the trial court abused its discretion, in violation of his due process right to a fair trial, by permitting him to appear in prison garb on the first day of jury selection.

In Estelle v. Williams, 425 U.S. 501 (1976), the Supreme Court established that a defendant cannot be compelled to stand trial before a jury in identifiable prison garb.  The Court reasoned that to force a defendant to appear in such fashion would impair the constitutional presumption of innocence while furthering no vital state interest.  425 U.S. at 505.  A represented defendant's failure to object at trial to appearing in prison garb, however, "is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."  425 U.S. at 512-13.  Additionally, even where a defendant is

compelled to wear prison clothes at trial, that constitutional error is subject to harmless error analysis.  See, e.g., United States v. Hurtado, 47 F.3d 577, 581 (2d Cir.) (collecting cases), cert. denied, 516 U.S. 903 (1995).

Here, as noted above, the Appellate Division found that Petitioner had procedurally defaulted on his claim of a constitutional violation arising out of his appearance before the jury in prison clothing, precluding consideration of the claim by this Court.  In any event, there is no evidence that Petitioner was compelled by the trial court to appear in prison clothing. Finally, any constitutional violation that may have occurred was clearly harmless.  Again, as noted by the Appellate Division, any reasonable juror would have known that Petitioner was incarcerated at the time of his trial.  In any event, the appearance in prison clothing occurred only on the first day of jury selection.

For all the foregoing reasons, Petitioner is not entitled to relief on this claim.

C.   Sixth Amendment Right to Counsel of Choice

Finally, Petitioner asserts that he was deprived of his Sixth Amendment right to counsel of choice when the Public Defender replaced Ms. Aifer without Petitioner's knowledge or consent.

The Appellate Division rejected this claim.

> We add only that the Public Defender represented
> defendant and, in the absence of prejudice, had the
> right to substitute counsel before the jury was sworn
> and empanelled.  See, e.g., United States v. Gonzalez-
> Lopez, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165
> L.Ed.2d 409, 416 (2006) (discussing "right of a
> defendant who does not require appointed counsel to
> choose who will represent him."); State ex rel. S.G.,
> 175 N.J. 132, 141, 814 A.2d 612 (2003).

State v. Cooper, 410 N.J. Super. 43, 75 (N.J. Super. App.Div.

2009).

The Sixth Amendment to the U.S. Constitution provides that

"[i]n all criminal prosecutions, the accused shall enjoy the

right ... to have the Assistance of Counsel for his defence."

"[A]n element of this right is the right of a defendant who

does not require appointed counsel to choose who will represent

him." United States v. Gonzalez-Lopez, 548 U.S. 140 (2006)

(emphasis added) (citing Wheat v. United States, 486 U.S. 153,

159 (1988)).  Erroneous deprivation of the right to counsel of

choice is a "structural error," not subject to "harmless error"

analysis. Gonzalez-Lopez, 548 U.S. at 150.  "[T]he right to

counsel of choice[, however,] does not extend to defendants who

require counsel to be appointed for them." Id. at 151.

Here, Petitioner was represented by the Public Defender.

Accordingly, he had no constitutional right to choose the

appointed counsel who would represent him.  Petitioner is not

entitled to relief on this claim.

42

IV.  <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Nor would jurists of reason find it debatable whether this Court was correct in its

procedural rulings regarding Petitioner's procedurally defaulted claims.  Accordingly, no certificate of appealability will issue.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition shall be denied.  No certificate of appealability will issue.  An appropriate order follows.


*/s/ Anne E. Thompson*
ANNE E. THOMPSON
United States District Judge

Dated:  April 2, 2013